# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SEHOY ENERGY LP, DEAN KETCHAM, and HAVEN REAL ESTATE FOCUS FUND, LP, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 12387-VCG |
| | ) ) | |
| ALBERT ADRIANI, HAVEN REAL ESTATE GROUP, LLC, HAVEN CHICAGO, LP, HAVEN PROPERTY MANAGEMENT, LLC, HAVEN NNN INVESTMENTS LLC, and ELBOW GREASE JANITORIAL SERVICE, INC., | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 18, 2021
Date Decided: June 16, 2021

John P. DiTomo and Miranda N. Gilbert, of MORRIS NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Plaintiffs Sehoy Energy LP, Dean Ketcham, and Haven Real Estate Focus Fund, LP*.

Elizabeth S. Fenton, of SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware, *Attorneys for Defendants Albert Adriani, Haven Real Estate Group, LLC, Haven Chicago, LP, Haven Property Management, LLC, Haven NNN Investments LLC, and Elbow Grease Janitorial Service, Inc.*

**GLASSCOCK, Vice Chancellor**

This brief post-trial decision involves a rather carelessly made seven-figure investment into a carelessly run investment fund. Unsurprisingly, the investment fared poorly. Carelessness with one's own property is no tort, but fraud is, and the method used by the Individual Defendant, Albert Adriani, to induce the investment was fraudulent.

In short, the Defendant promised the principals of Plaintiff Sehoy Energy LP, a family-run investment vehicle, that he would invest its money in publicly traded securities. Instead, he intended to, and did, use the money to extend poorly secured loans to a personal friend, who had plans to open "Tilted Kilt" franchises.[1] Adriani had heavily invested his own money in this scheme and was anxious that it succeed; the result was a classic example of good money chasing bad. The Plaintiffs invested in Adriani's fund under false pretenses and seek, *inter alia,* rescissory damages.

The Defendant has an MBA from one of the country's finest universities and was an experienced hedge-fund manager before venturing out on his own. He points out that he has lost all his own funds in addition to the Plaintiffs', that he is now making a living driving a truck, and he asks for equitable consideration due to the straitened conditions he now endures. I believe that Adrianni got in over his head and made a series of bad decisions that he hoped would make him, and his clients,

---

[1] These appear to be faux-Celtic versions of the more widely known "Hooters" restaurants. *See generally* Tilted Kilt Home Page, tiltedkilt.com (last visited June 15, 2021).

whole. But fraud is poor ground on which to build an appeal to equity. The Plaintiffs are entitled to rescissory damages, together with interest thereon. A recitation of the facts, which are largely uncontested, and a brief explanation of my reasoning, follows.

## I. BACKGROUND

The facts in this post-trial memorandum opinion are either stipulated to in the parties' pre-trial and post-trial stipulations or were proven by a preponderance of evidence at trial.[2]

### A. The Parties and Relevant Non-Parties

Defendant Albert Adriani ("Adriani") is an experienced hedge-fund and portfolio manager.[3] He received both his MBA and his BA in Finance with honors from the University of Chicago.[4] He has worked as a chartered financial analyst for several well-known institutions and for several years.[5] The other defendants in this case are all entities affiliated with Adriani; he either owns them outright or owns significant interests in them.[6] Adriani has petitioned for personal relief under Chapter 7 of the Bankruptcy Code.[7]

---

[2] Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JX page ("JX __, at ___").
[3] Joint Statement of Facts ¶ 1, Dkt. No. 218 [hereinafter "Stip."].
[4] *Id.*
[5] *Id.*
[6] *Id.* ¶¶ 2–6.
[7] *Id.* ¶ 1.

Defendant Haven Real Estate Group LLC ("Haven REG") is an Illinois limited company that Adriani founded in 2009.[8] Adriani is the sole member and 100% owner of Haven REG; and Adriani has testified that he views himself and Haven REG interchangeably.[9] Haven REG is the general partner of Plaintiff Haven Real Estate Focus Fund, L.P.[10] Like Adriani, Haven REG has also petitioned for relief under Chapter 7 of the Bankruptcy Code.[11]

Defendant Haven Property Management LLC ("Haven PM") is an Illinois limited liability company that Adriani and non-party Kazi Hassan ("Hassan") founded in 2012.[12] Initially, Adriani and Hassan each owned 47.5%, with Adriani's fiancé Ellen Jackson owning 5%.[13] Adriani now owns 100% of Haven PM—and, like Adriani, Haven PM has also petitioned for relief under Chapter 7 of the Bankruptcy Code.[14] Haven PM is the general partner of Defendant Haven Chicago LP.[15]

Defendant Haven Chicago LP ("Haven Chicago") is a Delaware limited partnership that Adriani and non-party Kazi Hassan ("Hassan") founded in 2012.[16]

---

[8] *Id.* ¶ 2.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 4.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* ¶ 3.

Haven Chicago was formed to invest in distressed residential real estate properties in Chicago that were owned by Hassan.[17] Haven Chicago has seven limited partners, "comprised principally of Adriani's friends and family."[18] Through their ownership of Haven PM, Haven Chicago's general partner, Adriani and Hassan jointly controlled Haven Chicago.[19] And, like Adrinai and the other Haven entities, Haven Chicago has also petitioned for relief under Chapter 7 of the Bankruptcy Code.[20]

Defendant Haven NNN Investments LLC ("Haven NNN") is a New Hampshire limited liability company that Adriani formed in 2015.[21] Adriani owns 50% of Haven NNN; the remainder is held by two other individuals, Lynn Lewis and Nora Coers.[22] Haven NNN has, like the other Defendants, petitioned for relief under Chapter 7 of the Bankruptcy Code.[23]

Defendant Elbow Grease Janitorial Services, Inc. ("Elbow Grease") is an Illinois corporation that provides commercial janitorial services.[24] It, too, has petitioned for Chapter 7 relief. Adriani purchased Elbow Grease in 2015 and is its sole owner.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* ¶ 5.
[22] *Id.*
[23] *Id.*
[24] *Id.* ¶ 6.

Plaintiff Haven Real Estate Focus Fund, L.P., ("Focus Fund") is a Delaware limited partnership that Adriani formed in 2011. It is managed by its general partner, Haven REG, which, as mentioned, is owned and controlled by Adriani.[25]

Plaintiff Sehoy Energy LP ("Sehoy") is a Delaware limited partnership that invested in and was a limited partner in Plaintiff Focus Fund. Sehoy is a portfolio company within Sehoy Investments, a family concern,[26] and was established "for exploration and drilling in the oil and gas space."[27] It is owned by a group of family members, including Calisle Dean ("Dean"), Dean's brother Warren Dean, Dean's sister Leatrice Elliman, and Plaintiff Dean Ketcham ("Ketcham").[28] Dean, as Sehoy's managing partner, makes all final investment decisions for Sehoy and testified on Sehoy's behalf at trial.[29]

Plaintiff Ketcham is Dean's first cousin and a limited partner in Sehoy.[30] He also directly invested in and was a limited partner in Focus Fund.[31] Ketcham did not testify at trial; the parties have agreed that Sehoy's testimony will bind and apply with equal force to Ketcham.[32]

---

[25] *Id.*
[26] *Id.* ¶¶ 7–8.
[27] *Id.* ¶ 8.
[28] *Id.*
[29] *Id.*
[30] *Id.* ¶ 9.
[31] *Id.*
[32] *Id.*

5

Non-party Kazi Hassan is an individual and Adriani's acquaintance of over 10 years. For a time, he was a managing member of Haven PM and owned 47.5% of that company.

*B. Factual Background*

1. Adriani and Focus Fund's involvement with Hassan prior to the Plaintiffs' investment

Adriani began investing with Hassan, whom he considered a close friend, in 2012, in order to recoup an approximately $1 million loss from an investment Adriani had made in a company called China Agritech.[33] Adriani's investment with Hassan began with loans from entities Adriani owned, including Haven REG and Haven Chicago.[34] From 2012 onward, Haven REG loaned Hassan approximately $1.2 million,[35] whereas Haven Chicago loaned Hassan over $1 million.[36] Particularly relevant to this opinion, Adriani also caused Plaintiff Focus Fund to make two loans to Hassan in 2012.[37]

The first of these loans is represented by a $225,000 note ("Note 1"), dated September 20, 2012, with a maturity date of December 20, 2012, and made out to an entity owned by Hassan.[38] As security for this loan, the note lists a piece of

---

[33] *Id.* ¶ 22–23.
[34] *Id.* ¶ 23–24.
[35] *Id.* ¶ 23.
[36] *Id.* ¶ 24.
[37] *Id.* ¶ 25.
[38] *Id.* ¶ 26.

6

property located in Chicago, Illinois.[39]  The second loan, which is represented by a $125,000 note ("Note 2"), is dated October 23, 2012, was notarized in February 2012, and has a maturity date of December 23, 2012.[40]  It is made out to the same Hassan entity as Note 1.[41]  At trial, Adriani testified that he did not request diligence materials from Hassan nor did he investigate the financial conditions of the Hassan entity to which Focus Fund loaned money.[42]

By December 2012, around the maturity dates of both notes, the amount of the loans—$350,000—represented 25% of Focus Fund's assets under management.[43]  Both loans went into default, as did some loans made by Haven REG and Haven Chicago to other Hassan entities.[44]

### 2. Sehoy expresses interest and Adriani provides materials

In early 2013, Plaintiff Sehoy began exploring various investments in publicly traded, managed funds, in an attempt to divest from oil and gas.[45]  To do so, Sehoy worked with Toby Elliman, a hedge-fund industry veteran who is also married to one of Sehoy's owners.[46]  Elliman, who learned of Focus Fund through a third-party service that provides research and analytics on market participants in publicly traded

---

[39] *Id.*
[40] *Id.* ¶ 27.
[41] *Id.*
[42] *Id.* ¶ 31.
[43] *Id.* ¶ 30.
[44] *Id.* ¶ 32.
[45] *Id.* ¶ 33–34.
[46] *Id.* ¶ 35.

securities funds, brought Focus Fund to Sehoy's attention.[47]  At trial, Dean testified that Focus Fund appeared to be an attractive investment opportunity because of its smaller size and because of Adriani's pedigree.[48]

Sehoy and Adriani began discussing a potential investment by Sehoy in Focus Fund starting in January 2013.[49]  Between January and March of that year, Adriani provided the Plaintiffs with written promotional materials for Focus Fund.[50]  The materials included a Private Placement Memorandum ("PPM"),[51] Focus Fund's Limited Partnership Agreement ("LPA"),[52] a pitch book ("Pitch Book"),[53] audited returns that tracked the performance of Adriani's self-managed IRA accounts ("Audited Returns"),[54] and a one-pager ("One-Pager").[55]  After review of these materials, I find as a matter of fact that they provided that Focus Fund's purpose was to invest in publicly traded securities.

The Audited Returns consist of two audited returns that were prepared to track the investment performance of stocks held in Adriani's IRA account between 2009 and 2011.[56]  The parties have stipulated that both the audited returns showed that

---

[47] *Id.* ¶ 35.
[48] *Id.* ¶ 36.
[49] *Id.* ¶ 37.
[50] *Id.*
[51] JX 020.
[52] JX 004.
[53] JX 051.
[54] JX 064.
[55] JX 730.
[56] Stip. ¶ 38.

Adriani's IRA account only contained publicly traded securities at the time.[57] Further, "Adriani testified that if investors were to rely on the information contained in the audited returns, they would know that the holdings in the account were publicly traded stocks."[58]

> The One-Pager describes Focus Fund's investment strategy as investing
>
> opportunistically across all areas of the real estate securities universe. Public market investments such as common stocks, options, preferred stock, fixed income, and convertible securities are considered indirect real estate investments. Long and short indirect positions may be established through selling options. Covered option writing may be used to enhance returns and reduce risk.[59]

It shows Focus Fund's audited returns for the period between 2009 through 2011, as well as investment results for 2012.[60] The results were benchmarked to the IYR ETF and the S&P 500—indices for publicly traded securities.[61]

The Pitch Book, which was prepared by Adriani, describes Focus Fund's investment strategy as investment in "REITs and Real Estate Related Securities."[62] It also provides that Focus Fund "invests opportunistically across all areas of the real estate securities universe" and that "[p]ublic market investments such as common stocks, options, preferred stock, fixed income and convertible securities are

---

[57] *Id.* ¶¶ 39–40.
[58] *Id.* ¶ 41.
[59] *Id.* ¶ 42.
[60] *Id.* ¶¶ 43–44.
[61] *Id.* ¶ 45.
[62] *Id.* ¶¶ 47–49.

candidates for investment."[63] The Pitch Book also notes that taking long and short positions was part of Focus Fund's strategy—a strategy that Adriani testified was a reference to a trading strategy used in investing in public securities.[64] Finally, the Pitch Book highlights historical investments in several publicly traded real estate companies and also refers to publicly traded real estate stock indices, such as the IYR ETF, as a benchmark.[65] Dean testified that the Plaintiffs understood the investment philosophy, reflected in the Pitch Book, was that Focus Fund would invest in public markets and securities—and that such a strategy fit the Plaintiffs' wishes.[66]

> The PPM describes Focus Fund's purpose as:
>
> A pooled investment vehicle. The Partnership [Focus Fund] was formed to pool investment funds of its investors . . . for the purpose of active and speculative trading . . . in publicly traded real estate securities listed on the U.S. stock exchanges.[67]

At trial, Adriani testified that he agreed that investors were entitled to rely on the PPM.[68] Dean testified that the Plaintiffs did indeed rely on the PPM and understood Focus Fund's purpose to be as stated in the PPM—that is, that Focus Fund's purpose was to invest in publicly traded real estate securities.[69] Finally, Adriani also testified

---

[63] *Id.* ¶ 50.
[64] *Id.* ¶ 51.
[65] *Id.* ¶ 54.
[66] *Id.* ¶ 57.
[67] *Id.* ¶ 60.
[68] *Id.* ¶ 61.
[69] *Id.*

that, at the time the Plaintiffs were considering investing in Focus Fund, he told them that he intended to execute the strategies stated in the PPM.[70]

Finally, the LPA, at Section 1.03, describes Focus Fund as:

> a fund through which the assets of its Partners may be utilized for the purpose of active and speculative trading in publicly traded real estate securities listed on the U.S. stock exchanges. The Partnership invests opportunistically across all areas of the real estate securities universe. Public market investments such as common stocks, options, preferred stock, fixed income, and convertible securities are considered indirect real estate investments. Long and short indirect positions may be established through selling options. Covered option writing may be used to enhance returns and reduce risk. The Partnership shall not trade in commodities or futures contracts unless such activities are managed by an entity that is registered as a commodity pool operator with the Commodities Futures Trading Commission and is a member of the National Futures Association, unless such entity is exempt from such registration and membership requirements.[71]

The LPA provides that the General Partner of Focus Fund "shall invest the funds of the Partnership from time to time as the General Partner deems appropriate *in accordance with the purposes set forth in Section 1.03 . . . .*"[72] While Section 3.02 of the LPA provides the General Partner with "sole and absolute discretion" in allocating all of the Partnership's assets, Adriani agreed that the General Partner did not have the discretion to change Focus Fund's purpose.[73] The parties have

---

[70] *Id.*
[71] *Id.* ¶ 65.
[72] *Id.* ¶ 66 (emphasis added).
[73] *Id.* ¶¶ 62, 66.

11

stipulated that the Plaintiffs reviewed and relied upon the LPA in making their investment decision.

While the negotiations with the Plaintiffs over their potential investment were ongoing, Focus Fund accepted two more notes from Hassan entities.[74] The first, a February 20, 2013 note ("Note 3"), was exchanged for an informal agreement by Adriani to roll over Notes 1 and 2—which, as the reader will recall, were for $350,000.[75] Focus Fund's balance sheet records Note 3 as at a cost of $350,000; the note was issued by another Hassan entity.[76] Note 3 described the rolled over amount as a business loan; however, Adriani testified that he did not receive solicitation materials from Hassan nor did he investigate the credit worthiness of Hassan or his entities when rolling Notes 1 and 2 into new loans.[77]

The second note, dated March 20, 2013 ("Note 4"), is in the amount of $300,000, is issued by the same Hassan entity that issued Note 3, and also describes the loan as a business loan.[78] Accordingly, by the end of March, Focus Fund's loan portfolio consisted of $650,000—an amount that represented 43% of Focus Fund's assets under management at the time.[79]

---

[74] *Id.* ¶ 68.
[75] *Id.* ¶ 69.
[76] *Id.*
[77] *Id.* ¶ 70.
[78] *Id.* ¶ 71.
[79] *Id.* ¶ 72.

At trial, Adriani testified that he did not tell the Plaintiffs or the other investors that there were $650,000 in loans outstanding prior to their investment.[80] He also testified that he did not inform any potential investors, including the Plaintiffs, that $350,000 of those $650,000 were for loans that were originally due in December, 2012.[81] None of the promotional materials—such as the Pitch Book and the PPM—disclosed the outstanding loans or the fact that making loans was part of Focus Fund's then-existing investment strategy.[82]

### 3. The Plaintiffs' Investment with Focus Fund

Prior to investing—and unaware, at the time, of Focus Fund's loans to Hassan entities—the Plaintiffs requested and received two changes to Focus Fund's governing documents.[83] First, the Plaintiffs sought an addendum to Focus Fund's LPA that, among other things, reduced the General Partner's management fee from 1.50% to 0.75%,[84] reduced the General Partner's performance allocation from 20% to 10%,[85] amended the limited partner capital account withdrawal procedure,[86] and amended the LPA to allow Sehoy and Ketcham to withdraw the entirety of their partnership interest at any time.[87]

---

[80] *Id.* ¶ 73.
[81] *Id.*
[82] *Id.* ¶ 74.
[83] *Id.* ¶ 75; *see id.* ¶¶ 73–74.
[84] *Id.* ¶ 76.
[85] *Id.* ¶ 77.
[86] *Id.* ¶ 78.
[87] *Id.* ¶ 80.

Second, the Plaintiffs requested that Adriani remove language in the PPM that provided for reimbursement of the General Partner's:

> professional and other advisory and consulting expenses and travel expenses incurred in connection with investment due diligence, monitoring or the assertion of rights or pursuit of remedies (including, without limitation, pursuant to bankruptcy or other legal proceedings, or the participation in informal committees of creditors or other security holders of an issuer).[88]

In its stead, the parties inserted the language "(D) INTENTIONALLY OMITTED."[89]

Sehoy invested $1.18 million in Focus Fund in April 2013, following receipt and review of the PPM, LPA, Pitch Book, Audited Returns, and the One-Pager, and after negotiating the amendments to the LPA and PPM.[90] Ketcham purchased his $500,000 interest in Focus Fund in May 2013.[91]

### 4. Post-investment

Three days after Sehoy's investment in April 2013, Adriani caused Focus Fund to make three additional loans, of $200,000 each, to Hassan.[92] Around the time when Ketcham invested, Adriani caused Focus Fund to roll over two outstanding loans to Hassan; these loans were in the amounts of $150,000 and $250,000.[93] And

---

[88] *Id.* ¶ 82.
[89] *Id.*
[90] *Id.* ¶¶ 84–85.
[91] *Id.* ¶ 86.
[92] *Id.* ¶ 88.
[93] *Id.*

in June, Focus Fund provided Hassan $250,000 in additional loans.[94]  Within three months of the Plaintiffs' investment, Focus Fund's outstanding loans to Hassan or his entities ballooned from $650,000 (representing 43% of Focus Fund's assets under management)[95] to $1.9 million (representing 50% of Focus Fund's assets under management).[96]  Focus Fund's statement of operations for June 2013 reflected $126,000 of total note interest as a return for Focus Fund.[97]  Hassan did not, however, pay any interest on the loans.[98]  Focus Fund's portfolio of loans to Hassan continued to grow throughout 2013; by the end of the year, Focus Fund's outstanding loans to Hassan and his entities exceeded $3 million, inclusive of principal and unpaid interest—an amount that represented more than 83% of Focus Fund's assets under management.[99]  This amount included Notes 1 and 2, which Hassan never repaid and which Focus Fund rolled over into new loans.[100]  Focus Fund's communications with its investors, at the time, did not disclose the status of the loans and communications throughout the year continued to treat the loans as performing assets, despite none of the loans being repaid by the maturity date.[101]

---

[94] *Id.* ¶ 89.
[95] *Id.* ¶ 72.
[96] *Id.* ¶ 89.  Although the loan amount tripled, I note that the percentage of assets increased only marginally—due to the size of the Plaintiffs' investment in Focus Fund.  In other words, the Plaintiffs' investments funded incremental credit extended to Hassan.
[97] *Id.*
[98] *Id.*
[99] *Id.* ¶ 90.
[100] *Id.*
[101] *Id.* ¶ 92; *see id.* ¶ 94.

15

The Plaintiffs received Focus Fund's K-1 tax returns for 2013 in or around June 2014.[102] At that time, Dean noticed a "high ratio of interest income to dividends" which came as a surprise.[103] Dean reached out to Elliman, who reached out to Adriani via email on June 5, 2014 to inquire why there was so much interest income.[104] Adriani admitted that that was due to "hard money loans" in Focus Fund's portfolio.[105] When Elliman asked what hard money loans were, Adriani responded that they were loans "secured by hard assets, such as real estate."[106] At a conference call requested by Elliman to discuss the high proportion of interest income, the Plaintiffs informed Adriani that they wanted him to get out of the loans because the Fund's focus was not supposed to be hard money loans and such loans had become too significant a portion of the portfolio.[107] Adriani testified at trial that he agreed to the Plaintiffs' request.[108]

### 5. The situation spirals

Despite that agreement, Adriani and his entities were unable or unwilling to get out of the loans to Hassan and, indeed, continued to attempt to finance him. On June 30, 2014, Haven Chicago bundled all loans previously made by that entity to

---

[102] *Id.* ¶ 102.
[103] *Id.* ¶ 103.
[104] *Id.* ¶¶ 103–04.
[105] *Id.* ¶ 104; JX 205.
[106] JX 205.
[107] Stip. ¶¶ 105–07.
[108] *Id.* ¶ 107.

Hassan into a new balloon loan totaling $1,276,878.[109] The balloon loan was secured by Hassan's interest in Haven Chicago.[110] Hassan's interest in Haven Chicago was also the security for Focus Fund's Note 4.[111] The security did not dissuade Hassan from borrowing from Adriani, however, nor did it seem to dissuade Adriani from attempting to find more money for Hassan. In July and August 2014, Adriani and Hassan began soliciting new investments for Haven Chicago, seeking to raise funds to purchase one of Hassan's entities.[112] That entity owned development rights for the Titled Kilt franchise in Central Illinois and "the plan was to then develop and build out Tilted Kilt franchise restaurants . . . ."[113] Adriani explained the plan as a "related party transaction, as we [Haven Chicago] are purchasing these assets from Kazi [Hassan]."[114]

On September 1, 2014, Adriani caused Focus Fund to roll over all of the fund's loans to Hassan and made an additional loan to Hassan in the amount of $220,000.[115] After that last loan, Hassan owed Focus Fund over $4.3 million, inclusive of accrued but unpaid interest.[116] Hassan had not, at the time, paid back any portion of the loans dating back to Note 1, which was issued in September

---

[109] *Id.* ¶ 108.
[110] *Id.* ¶ 109–10.
[111] *Id.* ¶ 110–11.
[112] *Id.* ¶ 112–13.
[113] *Id.* ¶ 113.
[114] *Id.* ¶ 115.
[115] *Id.* ¶ 125.
[116] *Id.* ¶ 123.

2012.[117] At trial, Adriani confirmed (1) that he continued making loans to Hassan between 2012 and 2014 even though Hassan never made any payment on the Focus Fund loans; (2) that he rolled old loans into new loans without receiving financial information into whether Hassan's projects were a credit risk; (3) that he never asked Hassan or his entities to furnish diligence materials; (4) that he never investigated the financial conditions of the Hassan entities he made loans to, and (5) that he never tracked the use of the loan proceeds after the loans were made.[118] Hassan did not repay the rolled over loan from Focus Fund totaling $4.3 million by the maturity date of December 13, 2014.[119] Adriani testified at trial that Hassan asked him to remain silent regarding the failure to repay, and Adriani did so.[120] Adriani did not seek to impair the loan at that time, nor did he seek legal advice regarding impairment.[121]

Adriani did, however, hire an attorney, Scott Lucas, to review Focus Fund's notes and to prepare documentation for Hassan's loans.[122] Lucas determined that Focus Fund needed different documentation with respect to the loans to Hassan and prepared a demand promissory note dated February 15, 2015 for the outstanding

---

[117] *Id.*
[118] *Id.* ¶ 124.
[119] *Id.* ¶ 129.
[120] *Id.* ¶ 130.
[121] *Id.*
[122] *Id.* ¶ 131

loans, totaling $4,389,735.35 (the "Promissory Note").[123]  Hassan and Adriani executed the Promissory Note,[124] which Adriani personally had recorded on Focus Fund's July 2015 balance sheet as a performing asset[125]—and Hassan promptly defaulted in March 2015.[126]  Hassan agreed to a consent judgment in May 2015 and Adriani obtained a consent judgment in the Circuit Court for Cook County, Illinois on July 17, 2015.[127]  Meanwhile, Adriani continued to report to the Plaintiffs about Focus Fund's performance without mentioning the status of the Hassan loans.[128]

### 6. The situation unravels

In December 2015, one of Focus Fund's investors requested a withdrawal of her investment in Focus Fund.[129]  On December 10, 2015, Adriani sent an email to Lucas requesting advice that said "[o]ne of the small investors in my hedge fund has request [*sic*] a full redemption of her investment.  Therefore, I must now tell everybody the situation."[130]  On December 15, 2015, Adriani sent a letter to Focus Fund's investors, essentially coming clean.  The letter informed investors that "a significant asset of Haven Real Estate Focus Fund has become substantially impaired" and that Focus Fund "cannot make any further distributions at this

---

[123] *Id.* ¶ 133.
[124] *Id.* ¶ 134.
[125] *Id.* ¶ 140.
[126] *Id.* ¶ 138.
[127] *Id.* ¶¶ 138–39; JX 384.
[128] *See id.* ¶¶ 141–48.
[129] *Id.* ¶ 152.
[130] *Id.* ¶ 153; JX 450.

time."[131] It further detailed that Focus Fund had, over the course of four years, issued loans totaling almost $4.4 million to Hassan and his entities to finance the acquisition and buildout of franchise restaurants.[132] However, the letter disclosed that Hassan had "performed as agreed, but notified [Adriani] he would not be able to make upcoming payments in early 2015."[133] At trial, Adriani confirmed that Hassan had not repaid *any* of Focus Fund's notes by their maturity date.[134]

In the December 15, 2015 letter, Adriani told investors that the legal fees expended in trying to recover against Hassan for the loan default were being paid from his own assets.[135] Adriani also told investors that he will "not receive anything on [his] investments until each of the limited partners are repaid their basis in full" and that he "personally ha[d] an additional $1.2 million debt outside of the Fund owed by Mr. Hassan."[136] That debt, per the letter, would be "contribute[d] to the Fund, and any portion of the recovery allocable to that separate debt will first go to the limited partners of the Fund until they recover their basis in full."[137] According to the letter, "each of the limited partners come first, ahead of [Adriani], period."[138]

---

[131] Stip. ¶ 155–56; JX 453.
[132] Stip. ¶ 157; JX 453.
[133] JX 453.
[134] Stip. ¶ 157.
[135] *Id.* ¶ 160; JX 453.
[136] JX 453.
[137] *Id.*
[138] *Id.*

At trial, Adriani testified that this $1.2 million debt was a reference to Haven REG's loans to Hassan, and that he was using Haven REG interchangeably with himself.[139]

On April 15, 2016, an asset of a Hassan entity was sold and $1,000,000 was disbursed to Haven Chicago.[140] The Plaintiffs moved to intervene in the proceedings to stop the sale until the parties could determine the appropriate allocation of the sale proceeds; Focus Fund, Haven REG, and Haven Chicago opposed.[141] The sale proceeds were allocated for distribution to Haven REG, Haven Chicago, and Focus Fund as part of citation proceedings before the Circuit Court of Cook County, Illinois;[142] the eventual allocation of the $986,438.74 net proceeds was $682,570.45 to Focus Fund, $120,048.53 to Haven Chicago, and $183,819.76 to Haven REG.[143] This allocation, per Adriani's trial testimony, was intended to be *pro rata* based on the value of the parties' respective loans to Hassan.[144] On May 13, 2016, Lucas emailed Adriani to inform him that he was sending the checks of the proceeds to each of the plaintiff entities—with one caveat: he would withhold $50,000 of the proceeds to Focus Fund as an "Advanced Payment Retainer" for "future litigation for the Haven Focus Fund."[145] At trial, Adriani confirmed that the $50,000 was

---

[139] Stip. ¶ 161.
[140] JX 564; Stip. ¶ 166.
[141] Stip. ¶ 167.
[142] *Id.* ¶ 167–68.
[143] *Id.* ¶ 168.
[144] *Id.*
[145] *Id.* ¶ 169.

intended to cover legal fees expended on attempting to recover loan amounts against Hassan.[146]

Sometime in either late 2015 or early 2016, Adriani contributed Haven REG's $1.2 million note to Hassan—the debt he had previously told investors in the December 15 letter that was his personal debt—to Focus Fund with a 75% markdown.[147] Accordingly, Adriani attributed only a $300,000 value to the $1.2 million debt.[148] At trial, Adriani confirmed that Haven REG's "capital account was increased by $300,000, after the [Haven REG] note was contributed to Focus Fund."[149] When Adriani requested Lucas' assistance with the "substantiation of the 75% write down" as it related to preparing Focus Fund's K-1 tax returns, Lucas responded that his guess was that the note was "worthless."[150]

### 7. The involvement of the other entity defendants

During discovery, the Plaintiffs discovered that Adriani and Haven REG made withdrawals from their Focus Fund capital accounts amounting to $152,988 in 2014 and over $ 1million in 2015.[151] Correspondence between Adriani and Lucas indicated that he treated his and Haven REG's capital account activity

---

[146] *Id.* ¶ 170.
[147] *Id.* ¶ 171–72.
[148] *Id.* ¶ 172.
[149] *Id.*
[150] *Id.* ¶ 174–75.
[151] *Id.* ¶¶ 181–82 (citing JX 379 and JX 622).

interchangeably.[152]   Some of these withdrawals were made on behalf of or in connection with the needs of other Adriani entities or for Adriani's own benefit.

For example, on February 18, 2015, Adriani purchased Defendant Elbow Grease for $275,000.  At trial, Adriani testified that he needed money from his Focus Fund capital account to purchase Elbow Grease and an email dated February 25, 2015 shows that Adriani listed his Focus Fund capital account as proof of funds for the Elbow Grease purchase.[153]  Elbow Grease was not acquired on Focus Fund's behalf; Adriani described the Elbow Grease transaction as necessary, explaining to his fiancée via text that "I have to do janitorial business.  It's my job back up."[154] That view was confirmed at trial.[155]

Further, it appears that some of the loans Focus Fund made to Hassan were in excess of what Hassan requested—and Adriani would instruct Hassan to pay the overage to Adriani's personal Haven REG account.[156]  Adriani testified at trial that similar transactions—in which Adriani caused Focus Fund to issue loans to Hassan and Hassan would kick back a portion of the loans to pay either Adriani or Haven REG—occurred two or three times.[157]

---

[152] *Id.* ¶ 183.
[153] *Id.* ¶ 184.
[154] *Id.* ¶ 185.
[155] *Id.*
[156] *Id.* ¶ 190 (quoting JX 403).
[157] *Id.* ¶ 196.

23

In October and November of 2015, Adriani withdrew a total of $60,000 "in connection with Haven NNN."[158]  In January 2016, Adriani withdrew another $45,000 for Haven NNN's redevelopment costs.[159]

*C. Procedural History*

The Plaintiffs filed their Verified Complaint against Adriani, Haven REG, and Haven Chicago on May 27, 2016, alleging breach of contract, breach of fiduciary duty, fraud, fraud in the inducement, and unjust enrichment.[160]  After much back and forth, a third amended complaint was filed on June 9, 2020.[161]  Trial was held over three days at the end of July, 2020 and post-trial argument was held on February 18, 2021.  This is my post-trial decision.

## II. ANALYSIS

The Third Amended Complaint contains eight counts against six different defendants.[162]  Count I alleges breach of contract against Adriani and Haven REG.[163]  Count II alleges breach of fiduciary duty against the same.[164]  Count III alleges aiding and abetting a breach of fiduciary duty against Haven Chicago and Haven

---

[158] *Id.* ¶ 187.
[159] *Id.*
[160] Verified Compl., Dkt. No. 1.
[161] Verified Third Am. and Supplemented Compl., Dkt. No 179 [hereinafter "Compl."].
[162] Compl. ¶¶ 188–242.
[163] *Id.* ¶¶ 188–194.
[164] *Id.* ¶¶ 195–201.

PM.[165]  Count IV alleges fraud against Adriani and Haven REG;[166] Count V alleges fraud in the inducement[167] and Count VI adds a claim of breach of the implied covenant of good faith and fair dealing against the same parties.[168]  Count VII seeks declaratory judgment and accounting against Adriani and Haven REG for wrongfully advanced legal fees.[169]  Finally, Count VIII alleges fraudulent transfer against Haven REG, Adriani, Haven Chicago, Haven NNN, and Elbow Grease.[170] As redress for these claims, the Plaintiffs seek declaratory judgment, rescissory or compensatory damages, attorneys' fees, and affirmative injunctive relief ensuring both (a) their ability to recover not only from Adriani but also his entities and (b) the primacy of their recovery over Adriani's with regards to proceeds obtained from Hassan.[171]

In summary, as to Adriani and Haven REG, the Plaintiffs allege breach of contract, breach of the implied covenant, breach of fiduciary duty, fraud, and fraud in the inducement.  Against Haven Chicago and Haven PM, they allege aiding and abetting a breach of fiduciary duty.  And they allege fraudulent transfer against Adriani, Haven REG, Haven Chicago, Haven NNN, and Elbow Grease.  They seek

---

[165] *Id.* ¶¶ 202–208.
[166] *Id.* ¶¶ 209–216.
[167] *Id.* ¶¶ 217–222.
[168] *Id.* ¶¶ 223–231.
[169] *Id.* ¶¶ 232–236.
[170] *Id.* ¶¶ 237–242.
[171] *Id.* at Relief Requested ¶¶ a–k.

monetary relief and injunctive measures to aid in that recovery. Given, however, that Adriani is the sole individual defendant—and therefore the defendant who caused the remaining defendants to allegedly breach duties, aid and abet breaches of duty, or fraudulently transfer funds—in this Memorandum Opinion, I address only the counts as they go to Adriani. The parties should meet and confer as to what remains of this matter given my findings, and, to the extent that the Plaintiffs seek judgment against the Defendant entities, whether entry of such judgment is opposed.

The operative complaint alleges that Adriani: (a) breached the LPA; (b) breached the implied covenant of good faith and fair dealing; (c) breached his fiduciary duties when operating Focus Fund through its general partner; (d) defrauded the Plaintiffs; (e) fraudulently induced the Plaintiffs to invest in Focus Fund; and (f) fraudulently transferred funds from Focus Fund to other entities he owned. Although many of these claims go to the same actions, at least three of them (the breach of contract claim, the implied covenant claim, and the fiduciary duty claim) rest on interpretation of Focus Fund's LPA.[172] That contract—or rather the circumstances in which it was formed—is itself the subject of Count V's fraud in the inducement charge. Accordingly, I resolve that count first.

---

[172] As a limited partnership, Focus Fund is owed fiduciary duties by the general partner and its controller to the extent governed by its limited partnership agreement. 6 *Del. C.* § 17-01101(f).

26

*A. Adriani fraudulently induced the Plaintiffs into investing in Focus Fund.*

The five elements of fraudulent inducement are:

(1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damages to the plaintiff as a result of such reliance.[173]

Based upon the evidence of record, I find that Adriani has satisfied all five elements. First, Adriani provided the Plaintiffs with solicitation materials—the PPM, Pitch Book, LPA, One-Pager, and the Audited Returns—which represented that Focus Fund's investment strategy and purpose was centered on investment in publicly traded securities. Second, Adriani knew this was false because, at the time those solicitation materials were provided, he had already caused Focus Fund to lend a substantial portion of Focus Fund's assets under management to Hassan, he continued to make loans while the Plaintiffs conducted diligence, and he made more loans right after the Plaintiffs' investment; Adriani, I find, used the Plaintiffs' investment for that hidden purpose. Third, Adriani intended the Plaintiffs to invest in Focus Fund, and misrepresented the Fund's purpose in pursuit of that goal. Fourth, the Plaintiffs' investment was made in justifiable reliance upon the

---

[173] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *21 (Del. Ch. Apr. 21, 2015), *aff'd sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019).

representation that Focus Fund's purpose was to invest in publicly traded securities. And fifth, the Plaintiffs have suffered damages through the mismanagement of their investment.

The Defendants disagree that these facts should lead to liability. They point out that the LPA and the purchase agreement (which the Plaintiffs entered into to purchase their interests in Focus Fund)[174] constitute the parties' entire agreement, and that the solicitation materials—including the Pitch Book, the PPM, and the Audited Records—have no bearing on those contracts.[175] The Defendants note that the LPA provided the General Partner broad discretion to allocate assets, purchase assets, and otherwise manage Focus Fund, and even the solicitation materials contained disclaimers against reliance.[176]

All of the Defendants' arguments rely on the agreement between the parties— *i.e.*, the LPA and the purchase agreement. Consequently, all three arguments are vulnerable to the Plaintiffs' point that the Plaintiffs were fraudulently *induced* into entering into an agreement with Focus Fund in the first place.

The Defendants are correct that Delaware courts do not allow a plaintiff to "'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging

---

[174] Compl., Ex. I.
[175] DF OB 19.
[176] *Id.*

28

that a contracting party never intended to perform its obligations."[177] "Stated differently, a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint that states a claim for breach of contract, or by alleging that the defendant never intended to abide by the agreement at issue when the parties entered into it."[178] That is not, however, what occurred here. Adriani did not enter into the LPA and purchase agreement with the Plaintiffs solely with the alleged intent to breach the agreements in the future. Rather, he was already loaning Focus Fund's money to Hassan—to the tune of a quarter of Focus Fund's assets under management[179]—when he presented the Plaintiffs with information about Focus Fund that was rendered incorrect by those existing loans. These actions, which were taken *prior* to the Plaintiffs' investment, mean the fraudulent inducement claim can stand on its own without the breach of contract claim—*i.e.*, even if Adriani had made no further loans to Hassan after the Plaintiffs' investment.

That such a fraudulent inducement claim can stand apart from a breach of contract claim is supported by precedent. "A claim for rescission or rescissory damages separates a fraudulent inducement claim from breach-of-contract

---

[177] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *22 (Del. Ch. Apr. 21, 2015), *aff'd sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019).

[178] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013).

[179] Stip. ¶ 30.

damages."[180] That is because fraudulent inducement renders a contract voidable, at the election of the innocent party.[181] Breach of contract does not. The Plaintiffs here seek "rescissory or compensatory damages."[182] Their claim for fraudulent inducement does not rely on the breach of contract claim.

To be clear, Adriani had already loaned 25% of Focus Fund's assets to Hassan by the time the Plaintiffs expressed interest in Focus Fund—and such notes are, obviously, not publicly traded securities. He then provided several solicitation materials to the Plaintiffs that indicated that Focus Fund's purpose was to invest in publicly traded securities. That information was false, and the Plaintiffs have adequately shown that they relied upon it in making their investment with Focus Fund. Adriani provided those materials—and the false information about Focus Fund's purpose being to invest in publicly traded securities—in order to persuade the Plaintiffs to invest with Focus Fund. He used those funds, in part, to immediately extend more credit to Hassan. Focus Fund has now declared bankruptcy, having funneled the Plaintiffs' investment into Hassan's ventures. The Plaintiffs have been damaged, due to their justifiable reliance on Adriani's false representations as to the purpose of Focus Fund. They are entitled to rescissory damages against Adriani or

---

[180] *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *18 (Del. Ch. June 29, 2020); *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *5 n.2 (Del. Super. Ct. Nov. 28, 2017).
[181] *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011).
[182] Compl. at Relief Requested ¶ j.

compensatory damages should they so elect. Given the speculative nature of benefit-of-the-bargain damages in this case, however, rescissory damages are the appropriate remedy.[183]

### III. CONCLUSION

I find that Adriani fraudulently induced the Plaintiffs to invest in Focus Fund. The Plaintiffs are entitled to rescissory damages, in the amount of the value of their investments, with interest calculated at the legal rate running from the time their investments were made. The parties should confer and inform the Court as to what issues, if any, remain outstanding, and to what extent the other Defendant entities should be subject to judgment.

---

[183] The Plaintiffs levied other viable claims against Adriani, including breach of contract, breach of fiduciary duty, and breach of the implied covenant. Because I find that the Plaintiffs are entitled to rescissory damages for fraudulent inducement, I need not reach a determination as to these other claims. *Carlyle Inv. Mgmt., L.L.C. v. Moonmouth Co. S.A.*, 2018 WL 5045716, at *2 (Del. Ch. June 28, 2018) ("[W]hen a party is induced to enter a contract through fraud[,] [s]uch a plaintiff has a choice between money damages or rescission[, which are] inconsistent remedies because they are contradictory to one another." (internal quotation marks omitted)).